## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ERIC BRADLEY BARNES**, | § | |
| | § | |
| *Plaintiff*, | § | |
| VS. | § | CIVIL ACTION 4:14-CV-0482 |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| Acting Commissioner of Social | § | |
| Security Administration, | § | |
| | § | |
| *Defendant.* | | |

## <u>MEMORANDUM AND ORDER</u>

In this case seeking judicial review of the denial of Social Security benefits, Plaintiff Eric Bradley Barnes ("Barnes") filed a Motion for Summary Judgment pursuant to 42 U.S.C. § 405(g). Dkt. 9. Defendant Carolyn W. Colvin ("Commissioner"), Acting Commissioner of Social Security, filed her own Motion for Summary Judgment and Brief in Support. Dkt. 10. The parties have consented to have this Court conduct all proceedings, pursuant to 28 U.S.C. § 636(c). Dkt. 5. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **ORDERS**, for the reasons set forth below, that Barnes' Motion for Summary Judgment is **GRANTED**, Defendant's Motion for Summary Judgment is **DENIED**, and this case be **REMANDED** for further proceedings.

## BACKGROUND

Barnes is a 43-year old man with a GED. Tr. 41. He has past relevant work experience in furniture sales, furniture delivery and setup, customer service, and dining

room management.  Tr. 44-45.  On March 15, 2012, Barnes filed a Title II application for a period of disability and disability insurance benefits claiming that he had been disabled and unable to work since July 17, 2009.  Tr. 66.  Barnes' application stated that he was unable to work due to suffering from "Stage IV rhabdomyosarcoma, Acquired Immune Deficiency Syndrome, bipolar disorder, anxiety with panic attacks/stuttering bilateral tinnitus, high cholesterol, migraine headaches, insomnia, lumbago, [and] chronic diarrhea."  Tr. 155.  Barnes also that he was experiencing a "lack of motivation and lack of interest in things" as well as anxiety, anxiousness, nervousness, racing thoughts, monthly panic attacks and "manic" periods.  Tr. 150.

*Medical Evidence[1]*

### *Physical Impairments: Cancer and AIDS*

In 1993, Barnes was diagnosed with an HIV infection and he subsequently developed Acquired Immune Deficiency Syndrome ("AIDS"), but he was prescribed medication that keeps the disease relatively well-controlled.  Tr. 268, 782, 862.

In 2001, Barnes was diagnosed with a testicular germ cell tumor and underwent a radical orchiectomy and chemotherapy.   Tr. 255, 771, 791.   In 2004, Barnes was

---

[1] Barnes has an extensive medical history.  As a result of another application for disability benefits, the Commissioner has already determined that Barnes was disabled during the period of February 29, 2004 through March 1, 2005.  Tr. 37.  However, his condition improved, and Barnes was found "not disabled" from March 2, 2005 through July 16, 2009.  *Id.*  In this present case, the parties agree that the time period at issue does not extend beyond June of 2010. Accordingly, there is only a narrow window of time at issue in this current application.  While the Court will consider *all* medical evidence presented in the record, only evidence informative of Barnes' condition during the relevant time period of July 17, 2009 through June 2010 will be addressed in detail.

diagnosed with cardiac rhabdomyosarcoma and underwent chemotherapy and radiation treatment.  *Id.*

From May 12, 2009 through November 2010, Barnes reported to the Thomas Street Clinic that he was experiencing "increasing headaches" and trouble breathing when bending his head down.  Tr. 274, 284, 291, 294.  Barnes stated that these were symptoms similar to those he experienced during his 2004 bout with cancer.  *Id.* However, Ben Taub General Hospital evaluated Barnes for a recurrence of his cancer multiple times from October 2008 through June 2009.  Throughout this time period, chest CTs revealed only a "stable heterogeneous partially calcified mass" that had been known to Barnes' doctors since at least September 21, 2005.  Tr. 329.  Head and neck CTs performed in June 2009 were found to be "unremarkable." Tr. 248, 250.  Importantly, no physician at Ben Taub ever noted that Barnes' cancer had returned, nor were any treatments ever scheduled by his doctors.  Through at least November 9, 2010, Barnes' calcified mass remained unchanged and all of his cancer markers were negative.[2] Tr. 268-69, 365.

From October 2008 through July 2011, Barnes' AIDS was described as "under excellent control" due to medication, and his CD4 and viral load counts were described as "great."  Tr. 364-69.  In fact, as late as November 2012, Barnes' HIV was described as "doing well on atripla with excellent CD 4 count and undetectable virus."  Tr. 785.

---

[2] In August 2012—long after the period at issue in this case—doctors found a retroperitoneal lymph node mass in Barnes' abdomen that was described as a "likely metastasis from testicular cancer." Tr. 782, 827.  "No malignant cells [were] identified" from the mass.  *Id.*  Nevertheless, the retroperitoneal mass was surgically removed and later indicated to be "invasive adenocarcinoma arising in mature teratoma."  Tr. 779, 782, 791.

However, Barnes struggled with his blood lipids and weight gain.  On April 30, 2009, Barnes' dyslipidemia was "not well-controlled [because Barnes] is intolerant of paravachol, lipitor, zetia, and tricor.  . . .  Not sure what else to recommend at this point besides dietary intervention."  Tr. 364.  Barnes' blood sugars were also found to be elevated.  *Id.*  However, by July 14, 2009, Barnes' blood sugars were "not a problem now."  Tr. 364-65.  On March 8, 2010, Barnes was diagnosed with hypertension. Tr. 365-366.  Four months later, it was noted that Barnes had "large weight gain and high diastolic BP, will likely require treatment for this."  Tr. 366.  Barnes' physicians noted that he has "compliance issues with both meds/appts," and that "compliance issues are huge at this point."  *Id.*  By 2011, Barnes' hypertension was mostly "adequate [] without meds" and his lipid profile and dyslipidemia controlled by Crestor.  Tr. 367-68.  Notably, at that time, Barnes was "doing well with meds/appts."  Tr. 369.  Nevertheless, he was still described as "noncompliant some of the time with the modifying factor of his diet." Tr. 404.

### *Mental Impairments*

On June 1, 2009, Barnes sought treatment from Dr. Zishan Samiuddin, M.D., stating that he had been experiencing trouble sleeping and depression "for the past 3 years," but he also described his current depression as "no more than usual."  Tr. 878, 882, 445.  Barnes stated that he "[c]annot sleep even with Ambien," had crying spells, isolated himself, felt overwhelmed and irritable, and that he had a passive death wish without suicidal ideation.  Tr. 882.  Dr. Samiuddin noted that Barnes "has seen me in the

past but failed to keep appointments." Tr. 446, 882. During this visit, Dr. Samiuddin recorded that Barnes displayed:

> Neurovegatative [sic] Symptoms:
> Decreased sleep, Decreased interest, Anhedonia, Decreased energy, Increased appetite, Weight gain, Psychomotor agitation, Psychomotor retardation.
>
> Manic Symptoms:
> Increased goal-directed activity, Psychomotor agitation, Decreased need for sleep, Increased talking, High risk activities in the past but now isolates.
>
> Anxiety Symptoms:
> Restlessness, Fatigue, Poor concentration, Irritability, Muscle tension, Poor sleep, Palpitations, Shaking, Nausea, Fear of losing control and Nightmares.

*Id.* Dr. Samiuddin diagnosed "Bipolar 2 Disorder" and determined that Barnes should "restart Seroquel and Zoloft." Tr. 445, 878, 883. Dr. Samiuddin also noted that Barnes had been hospitalized for psychiatric treatment when he was 15 years old. Tr. 446. A follow-up appointment was scheduled for July 1, 2009. Tr. 446.

Two months later, on August 28, 2009, Barnes was again seen for "psychiatric problem[s]," stating that he continued to experience trouble sleeping and feelings of depression "now and again." Tr. 436, 877. Barnes reported feeling "manicky," and "[f]eels he scares his mother by being irritable, restless, hyperactive and has to shut himself up in his room all day." Tr. 436. However, he denied "feeling depressed." *Id*. As a result, his prescription for Seroquel was increased and and he was told to continue taking Zoloft. Tr. 437. Notably, Barnes was described during this visit as "in no apparent distress," "socially appropriate," "cooperative and engages openly and fully," "no psychomotor agitation or retardation," "mood is euthymic and affect is reactive, congruent," "[d]enies suicidal or homicidal ideation," and his thought process was

"[l]ogical, coherent and goal directed, without loosening of associations or flight of ideas." Tr. 437.  While "[t]here is some "helplessness, hopelessness, worthlessness, [and] mild guilt.  There is no grandiosity.  There are no hallucinations or delusions.  His insight and judgment are well preserved.  Cognitive [abilities]: Grossly intact." *Id.*

On October 16, 2009, Barnes saw Dr. Samiuddin and reported that, "[s]ince [his] last visit feels as if his mood has stabilized. . . .  Reports his irritability has decreased; thought still hyperactive at times. . ." Tr. 422.  Dr. Samiuddin continued Barnes on Seroquel but decreased his Zoloft. *Id.*  Barnes was diagnosed with bipolar disorder and assigned a GAF (Global Assessment of Functioning) score of 65.  Tr. 423.

One year later, on October 4, 2010, Barnes again saw Dr. Samiuddin, reporting that "the anniversary of his father's death affects his mother more than it does him and he knows he feels much better when he takes Zoloft and Seroquel regularly.  He currently takes only Atripla and Restoril but this is not effective either for sleep or mood swings." Tr. 559.  Thus, Dr. Samiuddin restarted Barnes on Seroquel and Zoloft. *Id.*

On November 8, 2010, Barnes saw Dr. Samiuddin, stating that "his medications are helping him sleep a little better."  Tr. 558.  Barnes was continued on Seroquel and Zoloft. *Id.*  Two months later, Barnes saw Dr. Samiuddin and reported that he "stopped Zoloft because it nauseated him and he does not feel any different for the past 2 weeks.  He says that this mood is stable and he does not feel depressed. . . .  Overall he is satisfied with his current management and wants to return in 3 months." Tr. 542.  Dr. Samiuddin continued Barnes on Seroquel and discontinued Zoloft. *Id.*

On April 6, 2011, Barnes saw Dr. Samiuddin and described his mood as "stable," reporting that he "does not feel depressed." Tr. 393-94. Barnes was, however, having a hard time sleeping, so Dr. Samiuddin increased Seroquel. Tr. 394. Three months later, on July 6, 2011, Barnes again visited Dr. Samiuddin complaining of "crying spells" and "gradually feeling more depressed and sad over the past month." Tr. 389. Dr. Samiuddin increased Seroquel while adding Lamictal and Atarax. *Id.* On September 9, 2011, Barnes went to Dr. Samiuddin after his medications were denied due to a missed appointment. Tr. 377. Dr. Samiuddin subsequently gave Barnes his medications and noted that "[Barnes] perhaps feels a little less depressed but he still feels anxious. Atarax for temporary relief of anxiety is working for now." *Id.* Dr. Samiuddin continued Seroquel, Lamictal, and Atarax. *Id.* One month later, Barnes reported no benefits from Lamictal, but that Atarax provided "temporary relief of anxiety." Tr. 374. Nevertheless, Dr. Samiuddin continued Seroquel, Lamictal, and Atarax. *Id.* On November 23, 2011, Barnes was continued on Seroquel and Atarax, but his Lamictal was increased. Tr. 373.

### *Application for Benefits and Medical Expert Opinions*

On March 15, 2012, Barnes filed his application for social security disability benefits, claiming a disability onset date of July 17, 2009. Tr. 66. Barnes' application was initially denied on May 18, 2012 and again upon reconsideration on August 13, 2012. Tr. 84, 92.

On May 17, 2012, a "Case Assessment Form" was completed by Dr. John Durfor, M.D. Tr. 309. Dr. Durfor did not list any medically determinable impairments, finding instead that a "technical denial" of Barnes' application was appropriate because the

medical records that had been submitted thus far showed "insufficient evid. prior to DLI 6/30/10." *Id.*

On June 27, 2012, Dr. John Murphy, Ph.D., completed a "Psychiatric Review Technique" that assessed Barnes' mental impairments from July 17, 2009 through June 30, 2010.  Tr. 346.  Dr. Murphy noted that there was "insufficient evidence" to determine Barnes' medical disposition.  *Id.*  Dr. Murphy did, however, state that Barnes suffered from the "medically determinable impairment" of "Depressive DO, NOS (provisional) [and] Adjustment DO [with] Depressed Mood."  Tr. 349.  Dr. Murphy found there was insufficient evidence to assess Barnes' functional limitations posed by these mental disorders.  Tr. 356.  He noted a consultative examination in July 2008 had diagnosed Barnes with depression and adjustment disorder, and that Barnes had been assessed a GAF score of 45 at that time.  Tr. 358.  Dr. Murphy noted that there was "no other evidence in file of psych treatment prior to the [date last insured]."  *Id.*  Accordingly, he stated that he was "[u]nable to establish credibility due to insufficient evidence prior to the DLI."  Tr. 358.

Similarly, on July 25, 2012, a "Case Assessment Form" was completed by Dr. San-San Yu, M.D.  Tr. 360.  Dr. Yu listed Barnes' medically determinable impairments as: "HIV; Testicular Cancer; and Rhabdomyosarcoma."  *Id.*  However, Dr. Yu nonetheless found that a "technical denial" was appropriate because the "[a]vailable evidence [was] insufficient for assessment prior to the DLI."  *Id.*

8

***ALJ Hearing***

After Barnes' application was denied upon reconsideration, he requested a hearing before an administrative law judge ("ALJ"), which occurred on May 23, 2013 before ALJ Thomas G. Norman.   Tr. 38.   The ALJ heard testimony from Barnes, who was accompanied by a non-attorney representative, impartial vocational expert ("VE") Charles R. Poor, and impartial medical expert ("ME") Dr. Hubert James Stuart.  Tr. 39.

At the hearing, Barnes testified that he was 6'1" tall, currently weighed 326 pounds, and that his normal weight was between 190-195 pounds.  Tr. 42.  Barnes stated that he received his GED in the early 1990s and he testified about his prior work experience in furniture sales, furniture delivery and setup, as a customer service coordinator, and as a dining room manager.  Tr. 41, 44-45.

When asked to describe the number one problem" that kept him from working, Barnes responded,

> Exhaustion.  Just being plain tired, I can't stand up for any long period of time.
> My feet, my legs go numb.  And doing the jobs I've always had [there was]
> nothing I could really do [but] just sit down.  It was always [a] hands on, up and
> moving type of position.

Tr. 46.  Barnes also testified about his three bouts with cancer, stating that they all likely stemmed from his original diagnosis of testicular cancer.  Tr. 47.  Barnes stated that he originally received chemotherapy to treat his testicular cancer, but was given both radiation and chemotherapy in 2004 to treat his rhabdomyosarcoma.  *Id.*  Barnes testified that, as a result of the chemotherapy, his exhaustion and fatigue has increased and that he constantly has a headache.  Tr. 48.

Barnes also testified that he has a HIV infection that has progressed to AIDS. Tr. 49.  He stated that his medications, which doctors occasionally vary, caused weight gain and an irritable stomach.  Tr. 49-50.

Barnes further testified that he had been diagnosed with bipolar disorder, and that his medication "sometimes" helps.  Tr. 50.  Barnes stated that he can "go through several different moods or stages in the same day," and that he also has anxiety attacks.  Tr. 51. Barnes testified that, at least once per month, but sometimes for several days in a row, his anxiety attacks are so severe that he "can't get out of bed" and "shut[s] the curtains and block[s] [himself] off from everyone."  *Id.*

Barnes testified that his feet "always tingle," will "fall asleep," and, when standing, start to "burn" after approximately five minutes.  Tr. 49, 52.  He stated that he has fallen because of the numbness and burning.  Tr. 52.  Barnes claimed that he could "probably walk around the outside of the building and then would have to stop and catch my breath."  *Id.*  Barnes further testified that sitting in a chair "kill[s] my back" and that he could probably sit "for about 20-25 minutes."  Tr. 52-53.  Barnes stated that he could carry about five pounds, but that he could not bend at the waist and pick up anything. Tr. 53.  Barnes further testified that he could not squat or kneel, and cannot reach overhead without having a "dizzy spell."  Tr. 53-54.

Barnes also testified that he sleeps about 6 hours per night, but that he is woken up every few hours by his "body jerk[ing]" and his "head snap[ping] really quickly."  Tr. 55. Additionally, Barnes has ringing in his ears and he stated that, "they're probably going to

ring the rest of my life." *Id.* Barnes testified that he needs to lie down two to three times per day "just to catch my breath," and naps for thirty minutes in the afternoons. *Id.*

While Barnes' partner does most of the household chores, Barnes stated that he can do small loads of laundry and that he feeds his pet donkey. Tr. 55-56. Barnes also testified that he drives once or twice per week, reads, and watches movies at home. Tr. 56-57.

Following Barnes' testimony, ME Stuart testified that he was board certified in psychiatry, but that he had not personally examined Barnes. Tr. 58. The following exchange occurred between the ALJ and Dr. Stuart:

> ALJ:  Please summarize that objective medical evidence and please state your opinion as to the severity. Now I do caution you a little bit in that most of this psychological or psychiatric records I saw came in '12. His insurability ran out on March 31, '10. So anything -- I didn't see anything basically in the record prior to that. But I'll, you know, bow to you if there was anything before that period.
>
> ME:  Well the first thing that I see here, your honor, is 7/19/11.
>
> ALJ:  Right, so did you see anything before '10?
>
> ME:  I didn't see anything before that.

Tr. 58-59. This was the extent of the ME's testimony. Barnes' representative declined to cross-examine the ME.

After the ME testified, the VE Charles Poor testified that Barnes' past work experience as a furniture mover was very heavy, semi-skilled work. Tr. 60. The VE also classified Barnes as having worked as an interior designer (light, skilled work) and as a customer service and sales clerk (both light, semi-skilled work). *Id.* Based upon Barnes'

age, education, and past work experience, the VE testified that someone limited to sedentary work, who could sit up to three hours at a time and could stand or walk for no more than two hours per workday, could not perform any of Barnes' past relevant work. Tr. 61.   However, the VE found that Barnes retained the transferable skills of communicating with the public, researching products, recording data accurately, and explaining policies and procedures to customers.  *Id.*

Therefore, the VE opined that such a person could work as a telemarketer, order clerk, and information clerk, and that these jobs were available in significant numbers in the local and national economy.  *Id.*  After cross-examination by Barnes' representative, VE Poor stated that a person who needed to take three unscheduled breaks, lasting 30 minutes each, would not be able to work on a competitive basis.  Tr. 64.

***ALJ's Decision***

After the hearing, the ALJ issued a decision finding that Barnes' date last insured was March 31, 2010, and that Barnes was not disabled from July 17, 2009 through his date last insured.  Tr. 13, 18.  The ALJ found Barnes had not engaged in substantial gainful activity since his alleged onset date, and that Barnes suffers from the severe impairments of "HIV positive status and obesity."  Tr. 13.  However, the also ALJ found that none of Barnes' impairments, alone or in combination, met or medically equaled the severity of a listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  In reaching this conclusion, the ALJ considered listings pertaining to Immune System Disorders (§ 14.08) and the impact of Barnes' obesity.  *Id.*

The ALJ evaluated Barnes' residual functional capacity ("RFC") and found that Barnes was able to perform the full range of sedentary work.  Tr. 14.  Based on this RFC, Barnes was found unable to perform any of his past relevant work.  Tr. 17.  Nevertheless, the ALJ determined that Barnes had acquired work skills from past relevant work that were transferable to other jobs existing in significant numbers in the local and national economies.[3]  *Id.*

Barnes requested a review of the ALJ's decision on September 3, 2013.  Tr. 1.  He submitted an additional 23 pages of medical evidence, which the Appeals Council considered and made a part of the record.[4]  Tr. 5.  The Appeals Council denied review on December 11, 2013.  Tr. 1.  Barnes now appeals to this Court and files a motion for summary judgment arguing that the ALJ's decision was in error.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).  Summary judgment "should be rendered if

---

[3] Telemarketer (DOT 299.357-014), order clerk (DOT 249.362-026), and information clerk (DOT 237.367-022).  Tr. 18.

[4] These 23 pages relate to Barnes' visits to the Thomas Street Clinic with Dr. Samiuddin on February 8, 2010, August 28, 2009, and June 1, 2009, as well as his refill appointments with Thomas Street Clinic pharmacists on February 4 and 5, 2010.  These records are almost entirely duplicative of information in the record that was submitted to the ALJ.

the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008); FED. R. CIV. P. 56(a), (c); *Celotex Corp.*, 477 U.S. at 322-23.   "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations and quotation marks omitted).

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision that a claimant is not entitled to benefits is governed by 42 U.S.C. § 405(g).  *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).   This review is limited to two issues: "(1) whether the decision is supported by substantial evidence on the record as a whole, and (2) whether the Commissioner applied the proper legal standard."  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007).   A finding of substantial evidence supporting the Commissioner's decision must "do more than create a suspicion . . . of the fact[s] to be established," while a finding of no substantial evidence is only appropriate if there is a conspicuous absence of  "credible evidentiary choices or medical findings" to support the

14

decision.  *Richard ex rel. Z.N.F. v. Astrue*, 480 F. App'x 773, 776 (5th Cir. 2012); *Stringer v. Astrue*, 465 F. App'x. 361, 363-64 (5th Cir. 2012).  In applying this standard, the court "may not reweigh the evidence or substitute our judgment for that of the Commissioner."  *Audler*, 501 F.3d at 447 (5th Cir. 2007).

## ANALYSIS

### A. Statutory Basis for Benefits

Barnes applied for applied for Social Security Disability Insurance ("SSDI") benefits.  SSDI benefits are authorized by Title II of the Social Security Act.  The disability insurance program provides income to individuals who are forced into premature retirement, provided they are both insured and disabled.  *See* 42 U.S.C. § 423(a).

### B. Determination of Disability

The Social Security Act defines the term "disability" to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore, a claimant is disabled "only if his physical or mental impairment[s] are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis of a disability claim to determine whether: (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. *See Audler*, 501 F.3d at 447-48 (5th Cir. 2007); 20 C.F.R. § 404.1520(a). If, at any step, a conclusive disability determination can be made, the inquiry ends. *Id.* The burden of proving disability initially lies with the claimant, but shifts to the Commissioner to show that the claimant can perform other substantial work in the national economy. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding. *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

Barnes raises two points of error to argue that he is entitled to summary judgment. First, Barnes claims that the ALJ incorrectly determined his date last insured and therefore improperly failed to consider medical evidence after this date. Second, Barnes claims that the ALJ failed to properly evaluate his mental impairments and erred by not finding that Barnes had a "severe" mental impairment.[5]

---

[5] The Court notes that the Commissioner's brief, submitted by a Special Assistant United States Attorney, is particularly unhelpful and wholly fails to respond to Barnes' arguments that the ALJ failed to fully evaluate Barnes' mental impairments and that the ALJ should have found his mental impairment(s) "severe."

## C.  Barnes' Date Last Insured

Barnes first argues that the ALJ incorrectly determined his date last insured

("DLI").  Because of this error, Barnes asserts that,

> [The] ALJ focused on Title II disability only from July 17, 2009 through March
> 31, 2010, the focus was too narrow . . . the focus should have been through June
> 30, 2010, almost an entire year of eligibility.  [The ALJ's] focus on potential
> disability through March 2010 was erroneous and precluded a fair and informed
> hearing and Decision.

Pl. Br. at 7.  The Commissioner concedes that Barnes' DLI should be June 30, 2010.

Def. Br. at 5 ("The ALJ erred when he referred to Plaintiff's date last insured as March

31, 2010, rather than June 30, 2010.").

However, the Court declines to reach this issue in light of its disposition of

Barnes' second point of error regarding the ALJ's failure to properly consider his mental

impairments.

## D. Evaluation of Barnes' Mental Impairments

Barnes' second point contends that the ALJ failed to fully evaluate his mental

impairments and that the ALJ should have found his mental impairment(s) to be "severe."

The Court agrees that the ALJ did not properly evaluate Barnes' mental impairments.[6]

---

[6] Accompanying his summary judgment brief, Barnes submitted additional evidence to this
Court that is not a part of the official administrative record in his current application.  Doc. 9-1.
This evidence originates from a prior application that culminated in the partial award of
disability benefits along with a finding that Barnes was not disabled from March 2, 2005 through
July 16, 2009.  Because this additional evidence is outside of the administrative record for this
case, the Court cannot consider it.  *See* 42 U.S.C. § 405(g) ("The court shall have power to enter,
*upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing
the decision of the Commissioner of Social Security. . ."); *Parks v. Harris*, 614 F.2d 83, 84 (5th
Cir. 1980) (medical evidence was "outside the administrative record and therefore not properly
before the court.").

In the portion of the decision finding that Barnes suffers from the "severe" impairments of HIV positive status and obesity, the ALJ made no mention of Barnes' non-severe impairments, including the mental impairments Barnes alleged in his application and testified about during the hearing.  Tr. 13.

The regulations at issue require that the Commissioner "follow a special technique at each level in the administrative review process."  20 C.F.R. § 404.1520a(a).  Using this "special technique," the Commissioner is required to: (1) evaluate the pertinent symptoms, signs, and laboratory findings to determine any mental impairments; (2) rate the degree of functional limitation resulting from these impairments; (3) determine the severity of mental impairments; and (4) document application of the technique.  *Id.* § 404.1520a(b)-(e).  To this end, if an ALJ determines that a claimant has a medically determinable mental impairment, he "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings in accordance with [§ 404.1520a(e)]."). *Id.* § 404.1520a(b)(1); *see also id.* § 404.1528 (defining symptoms, signs, and laboratory findings).

Here, the ALJ made no express finding as to whether Barnes suffered from any mental impairment and he similarly made no finding regarding the severity of that mental impairment.  The ALJ's opinion did not summarize the relevant medical evidence in the record, did not apply the "special technique," and did not document any findings as

---

This additional evidence describes a July 30, 2008 "Psychological Evaluation" that is both prior to Barnes' alleged onset of disability and generally unhelpful to an assessment of his impairments during the relevant timeframe of July 17, 2009 through June 30, 2010.  Moreover, the ALJ who evaluated Barnes' prior claim has already considered this evidence, and "decline[d] to consider the claimant's mental impairment as severe. . ."  Tr. 32.

required by 20 C.F.R. § 404.1520a.  Consequently, it is impossible to determine "the pertinent symptoms, signs, and laboratory findings," if any, that the ALJ evaluated in assessing Barnes' mental impairment(s).  *See* 20 C.F.R. § 404.1520a(b)(1).

The only discussion of a potential mental impairment in the ALJ's opinion are the ALJ's statements that Barnes testified that he suffered from bipolar disorder and that "[ME] Stuart testified that there is no medical documentation of a mental impairment." Tr. 15.  However, the medical records submitted to the ALJ before the hearing show that Barnes sought treatment for a mental impairment on at least eight occasions prior to July 19, 2011, and that he had been diagnosed with Bipolar Disorder and prescribed multiple medications for mental impairments.[7]   In light of Barnes' clear allegation in his application and again in his testimony that he suffered from bipolar disorder, anxiety, and depression, it is particularly troubling to this Court that neither ME Stuart nor the ALJ addressed this evidence.

Particularly relevant was Barnes' visit on August 28, 2009 with Dr. Samiuddin, who noted a "history of bipolar depression," trouble sleeping, and occasional feelings of depression.  Tr. 436-37.  At that visit, Dr. Samiuddin increased Barnes' Seroquel prescription to combat "manic" symptoms while maintaining his Zoloft prescription to address "depressive" symptoms.  *Id.*  Similarly, on October 16, 2009,  Barnes reported that "his mood has stabilized," but that his "thought [was] still hyperactive at times."

---

[7] These dates include June 1, 2009 (Tr. 445), August 28, 2009 (Tr. 436), October 16, 2009 (Tr. 422), October 4, 2010 (Tr. 559), November 8, 2010 (Tr. 558), January 7, 2011 (Tr. 542), April 6, 2011 (Tr. 393-94), and July 6, 2011 (Tr. 389).

Tr. 422.   Consequently, Dr. Samiuddin again diagnosed bipolar disorder and assigned Barnes a GAF score of 65.  Tr. 423.

Likewise, "[n]oncontemporaneous medical records are relevant to the determination of whether onset occurred on the date alleged by the claimant." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (*quoting Ivy v. Sullivan*, 898 F.2d 1045, 1048-49 (5th Cir. 1990)).  Although Barnes' June 1, 2009 visit with Dr. Samiuddin was 16 days prior to his alleged onset of disability, evidence from this visit might be probative of Barnes' condition during the applicable time period.  *See Loza*, 219 F.3d at 395-96 ("[O]nce evidence has been presented which supports a finding that a given condition exists it is presumed in the absence of proof to the contrary that the condition has remained unchanged.") (quoting *Rivas v. Weinberger*, 475 F.2d 255, 258 (5th Cir. 1973).

Similarly, "subsequent medical evidence is also relevant because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." *Loza*, 219 F.3d at 396. (*quoting Ivy*, 898 F.2d at 1049).  Barnes sought treatment from Dr. Samiuddin on five occasions in the one-year period following June 30, 2010, which the Commissioner now concedes is Barnes' date last insured.[8]  While these visits generally indicate that Barnes had only intermittent symptoms and that his medications were working, these facts do not absolve the ALJ obligation "to consider all the record evidence."  *See Loza*, 219 F.3d at 393.

---

[8] These dates include October 4, 2010 (Tr. 559), November 8, 2010 (Tr. 558), January 7, 2011 (Tr. 542), April 6, 2011 (Tr. 394), and July 6, 2011 (Tr. 389).

Nor is the ALJ absolved of this responsibility when the ME inaccurately summarizes medical records and states that a claimant has not received any treatment during the relevant period. While an ALJ may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairment(s) and on whether these impairment(s) equals the requirements of a listing, 20 C.F.R. § 404.1527(e)(2)(iii), it is still the ALJ's responsibility "to determine the credibility of medical experts [] and weigh their opinions accordingly." *Nugent v. Astrue*, 278 F. App'x 423, 426 (5th Cir. 2008) (*quoting Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). Importantly, the ALJ is directed to carefully evaluate any opinions given by non-treating physicians in light of "all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(c)(3). Dr. Stuart, who admitted that he had not examined Barnes personally, did not discuss Barnes' visits with Dr. Samiuddin, nor did he address Dr. Samiuddin's diagnosis and treatment of Barnes' mental impairments. Similarly, the ALJ wholly failed to discuss the opinions and findings of Dr. Samiuddin, who was Barnes' treating physician. 20 C.F.R. § 404.1527(c).

## CONCLUSION

The record reveals that the ALJ did not apply the correct legal standards in denying Barnes' disability benefits. A review of the pleadings and the record on file reflects that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(a), (c). Accordingly, the Court rules that Barnes' Motion for Summary Judgment is **GRANTED** and the Commissioner's Motion for Summary Judgment is **DENIED**. This case is **REVERSED** and **REMANDED** to the

Commissioner pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), so that the record can be further developed on the severity of Barnes' mental impairments, consistent with this opinion.

        SIGNED at HOUSTON, TEXAS on February 20, 2015.


_____
        GEORGE C. HANKS, JR.
UNITED STATES MAGISTRATE JUDGE